Ralph M. WYNN, M.D., et al.,
Plaintiffs-Appellees,

v.

Bernard CAREY, State's Attorney for
County of Cook, Illinois, etc., et al.,
Defendants-Appellants.

No. 78–1262.

United States Court of Appeals,
Seventh Circuit.

Argued April 17, 1978.

Decided Aug. 17, 1978.

John D. Gorby, John A. Dienner, III, Asst. State's Atty., Chicago, Ill., for defendants-appellants.

Lois J. Lipton, Roger Baldwin Foundation of ACLU, Inc., Merle L. Royce, II, R. Peter Carey, and Jeffrey W. Finke, Chicago, Ill., for plaintiffs-appellees.

Before SWYGERT, Circuit Judge, MOORE, Senior Circuit Judge,[1] and SPRECHER, Circuit Judge.

SWYGERT, Circuit Judge.

In this appeal we must determine whether the recently enacted Illinois Abortion Parental Consent Act is constitutional. The question pivots upon three separate important interests—those of the pregnant minor, her parents, and the State—which compete and at times directly conflict with each other. The statute is an attempt by the Illinois General Assembly to balance these competing interests. Our job is to determine whether the General Assembly was, within constitutional contours, successful in its endeavor.

I

On November 16, 1977 the Illinois General Assembly enacted the "Illinois Abortion

---

1. The Honorable Leonard P. Moore, United States Senior Circuit Judge for the Second Circuit, sitting by designation.

Parental Consent Act of 1977." Public Act 80–1139, Ill.Rev.Stat. ch. 38, §§ 81–51 *et seq.* This Act, set forth in full as the Appendix to this opinion, became effective on January 1, 1978.[2] Section 4 of the Act provides in part:

No abortion shall be performed in this State if the woman is under 18 years of age and has not married except:

(1) By a duly licensed, consenting physician in the exercise of his best clinical medical judgment;

(2) After the minor, 48 hours prior to submitting to the abortion, certifies in writing her consent to the abortion and that her consent is informed and freely given and is not the result of coercion; and

(3) After the consent of her parents is secured and certified in writing.

\* \* \* \* \* \*

If such consent is refused or cannot be obtained, consent may be obtained by order of a judge of the circuit court upon a finding, after such hearing as the judge deems necessary, that the pregnant minor fully understands the consequences of an abortion to her and her unborn child. Such a hearing will not require the appointment of a guardian for the minor. Notice of such hearing shall be sent to the parents of the minor at their last known address by registered or certified mail. The procedure shall be handled expeditiously.

The Act thus requires that an unmarried minor must attempt to obtain consent of her parents before she can obtain an abortion.[3] If one or both of her parents refuse to consent, the statute allows a minor to petition the court to authorize her abortion. The petition must be granted if the court finds that the minor is capable of making an informed decision. The attempt to obtain parental consent is in all cases, however, a prerequisite to initiating the judicial proceeding. Minors who are married, divorced, or widowed are not covered by the Act. Furthermore, it does not apply to any abortion "which is necessary for the preservation of the life of the mother." Any person who performs an abortion in violation of the Act commits a misdemeanor.

## II

This action for declaratory and injunctive relief was commenced in the district court on January 23, 1978. Asserting jurisdiction under 28 U.S.C. §§ 1331 and 1343(3) and seeking relief pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201 and 2202, plaintiffs claimed that the Parental Consent Act of 1977 violated the Due Process and Equal Protection Clauses of the Fourteenth Amendment.

The plaintiffs and the classes they represent are as follows:

(1) Jane Doe and Sally Roe, two unmarried minors under the age of eighteen, pregnant at the time of the filing of the suit, and residents of the State of Illinois. Each alleged that she wished to terminate her pregnancy without obtaining either parental consent or a judicial order. Plaintiffs were certified by the

---

**2.** The 1977 Parental Consent Act supplemented section 3(4) of the Illinois Abortion Law of 1975, Ill.Rev.Stat. ch. 38, § 81–23(4), which prohibited an unmarried woman under the age of eighteen from obtaining an abortion without the consent of one of her parents. This provision, almost identical to that struck down in *Planned Parenthood v. Danforth*, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), was recently held unconstitutional by a three-judge court in *Wynn v. Scott*, 449 F.Supp. 1302 (N.D. Ill.1978). Enforcement of the 1975 Act had been preliminarily enjoined at the time the 1977 legislation was enacted.

**3.** If both parents are not available the Act provides:

If one of the parents has died, has deserted his or her family, or is not available, consent by the remaining parent is sufficient. If both parents have died, have deserted their family, or are not available, consent of the minor's guardian or other person standing in loco parentis is sufficient.

district court as representative of a class of "all unmarried minor females desiring pregnancy terminations within the State of Illinois."

(2) Ralph M. Wynn, M.D., Allan G. Charles, M.D., Jerzy Jozef Biezenski, M.D., and Marvin Rosner, M.D., four physicians licensed to practice in Illinois. Each is engaged in the practice of obstetrics and gynecology, and each performs pregnancy terminations as part of his medical practice. Plaintiff-physicians were certified as representative of a class of "all duly licensed physicians and surgeons presently performing or desiring to perform pregnancy terminations on minor patients in the State of Illinois and on behalf of minor patients desiring pregnancy terminations within the State of Illinois."

The defendants and the classes they represent are as follows:

(1) William J. Scott, Attorney General of the State of Illinois.

(2) Bernard Carey, State's Attorney of Cook County, who is responsible for enforcing the Act in Cook County, Illinois. Carey, sued in his official capacity, was certified as a representative of all State's Attorneys of the various counties in Illinois.

(3) Paul Q. Peterson, M.D., Director of the Department of Health in the State of Illinois, who is charged under the Act with the responsibility of prescribing parental and judicial consent forms to be maintained by physicians on pregnancy terminations of unmarried minor women.

After the complaint was filed Eugene F. Diamond, M.D., a physician licensed to practice in Illinois and engaged in the practice of pediatrics, sought to intervene as a par-ty-defendant. The district court permitted Dr. Diamond to intervene and represent his own interest as a parent of a minor of child-bearing age.

After hearing arguments on plaintiffs' motion for a temporary restraining order, the district court on February 2, 1978 temporarily restrained the enforcement of the parental and judicial consent provisions [section 4(3)] of the Act. Thereafter the State's Attorney moved to dismiss the case and plaintiffs moved for entry of a preliminary injunction. On February 23, 1978 the district court denied the motion to dismiss and preliminarily enjoined the state defendants from enforcing the parental and judicial consent provisions contained in section 4 of the Act. 448 F.Supp. 997 (N.D.Ill. 1978).

In the memorandum decision accompanying its order, the district court rejected the State's Attorney's contention that plaintiffs lacked standing to bring this action. The court further denied his motion to dismiss on the grounds of abstention under *Railroad Commission v. Pullman Co.*, 312 U.S. 492, 61 S.Ct. 643, 85 L.Ed. 971 (1941), concluding that the importance and urgency of the rights claimed by the plaintiff class of minor women could not wait for piecemeal adjudication in the state courts interpreting the various sections of the Act. 448 F.Supp. at 1001–04.

Reaching the merits the district court concluded that section 4(1), requiring a physician to exercise "his best clinical medical judgment," was valid under *Doe v. Bolton*, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), and that section 4(2), requiring a forty-eight hour waiting period and written consent by the minor, was not unreasonably burdensome.[4] The court did, however, hold

---

4. The district court declined to rule on plaintiffs' challenge to the definition of "abortion" contained in section 3 of the 1977 Act, as a similar definition contained in section 2(6) of the Illinois Abortion Law of 1975 was, at the time the decision was entered, preliminarily enjoined by a three-judge court. That defini-tion was later declared unconstitutional in *Wynn v. Scott*, 449 F.Supp. 1302 (N.D.Ill.1978).

Plaintiffs in this action also challenged section 1 of the Parental Consent Act on the basis that it purportedly protects non-existent rights of unborn children. The district court refused to entertain this challenge as the section is not

that plaintiffs were entitled to a preliminary injunction with respect to the parental and judicial consent provisions contained in section 4(3). In summarizing its position, the court stated:

[T]he 1977 Act does not provide a judicial remedy, in lieu of parental consent, which meets the *Bellotti* [*v. Baird*, 428 U.S. 132, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976)] standards. The remedy is unduly burdensome. It is totally silent on procedures essential to its effective utilization. It makes parental consultation mandatory in all cases. The elements of the judicial inquiry are not limited to those which are constitutionally permissible. It is, in my judgment, void on its face.

448 F.Supp. at 1006.

Both the State's Attorney and the intervenor-defendant appealed from that part of the judgment holding section 4(3) unconstitutional and enjoining enforcement thereof.[5] Plaintiffs have not challenged the district court's upholding of the other sections of the Act.

### III

 At the outset, the State's Attorney contends that the district court should have abstained. The doctrine of abstention is "an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976). The doctrine cannot be invoked "to dismiss a suit merely because a State court could entertain it," *Alabama Service Commission v. Southern Railway Co.*, 341 U.S. 341, 361, 71 S.Ct. 762, 774, 95 L.Ed. 1002 (1951) (Frankfurter, J., concurring), nor does the "opportunity to avoid decision of a constitutional question . . . alone justify abstention by a federal court." *Colorado River, supra*, 424 U.S.

at 815 n.21, 96 S.Ct. at 1245. "Abdication of the obligation to decide cases can be justified under this doctrine only in the exceptional circumstances where the order to the parties to repair to the state court would clearly serve an important countervailing interest." *County of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 188–89, 79 S.Ct. 1060, 1063, 3 L.Ed.2d 1163 (1959). The State's Attorney asserts that two of the recognized types of abstention apply here: the *Pullman*-type and the *Burford*-type. For the reasons noted below, we hold that this case falls into neither type.

 A. *Pullman*-type abstention is appropriate "where an unconstrued state statute is susceptible of a construction by the state judiciary 'which might avoid in whole or in part the necessity for federal constitutional adjudication, or at least materially change the nature of the problem.'" *Bellotti v. Baird*, 428 U.S. 132, 147, 96 S.Ct. 2857, 2866, 49 L.Ed.2d 844 (1976). *See also Zbaraz v. Quern*, 572 F.2d 582, 584 (7th Cir. 1978) (*per curiam*). The doctrine was designed to avoid unnecessary federal constitutional challenges to state laws, thereby avoiding needless friction between the state and federal governments. *Railroad Commission v. Pullman Co.*, 312 U.S. 492, 61 S.Ct. 643, 85 L.Ed. 971 (1941); *Zbaraz v. Quern, supra*. Our first task is to determine whether the statute under scrutiny is unclear or uncertain, for if it is not, we need not reach the question whether state court resolution of the state issue will obviate or substantially modify the federal constitutional issue.

 We do not find the essential portions of the Parental Consent Act to be ambiguous. The requirements of the statute are plain: to obtain an abortion, every unmarried pregnant minor must obtain the written consent of both of her parents. If one or both refuse, she cannot obtain the abor-

---

substantive in nature and does not contain any requirements or impose any sanctions. There was, in short, nothing to enjoin.

5. Defendants Scott and Peterson did not file notices of appeal and did not participate in the appeal.

tion unless she initiates a judicial proceeding and the court finds that she fully understands the consequences of the abortion.

This case is therefore significantly different from *Bellotti v. Baird*, 428 U.S. 132, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976), where the Supreme Court directed the district court to abstain pending construction of the statute by the Supreme Judicial Court of Massachusetts. Although the statute in *Bellotti* is almost identically worded to the Illinois Act, the state defendants in that case argued that Massachusetts employed the mature-minor rule, whereby a minor capable of giving informed consent could obtain a court order permitting an abortion without parental consultation. On the basis of this construction, as well as several others advanced by the defendants,[6] the Supreme Court said:

> The picture thus painted by the [state defendants] is of a statute that prefers parental consultation and consent, but that permits a mature minor capable of giving informed consent to obtain, without undue burden, an order permitting the abortion without parental consultation, and, further permits even a minor incapable of giving informed consent to obtain an order without parental consultation where there is a showing that the abortion would be in her best interests. The statute, as thus read, would be fundamentally different from a statute that creates a "parental veto."

428 U.S. at 145, 96 S.Ct. at 2865. Finding that state judicial construction might substantially modify the federal constitutional challenge to the statute, the Court held abstention appropriate.[7]

On the other hand, the State's Attorney here concedes that the requirements of the Illinois Act are unambiguous: parental consent is required in *all* cases and a judge can pass on an application for a consent order *only* after one or both parents have refused to consent to the abortion. He does not suggest that Illinois employ the mature-minor rule or any other rule which would negate or bypass the statute's absolute requirement of parental notification. Thus, one of the plaintiffs' basic constitutional challenges—the requirement of parental consent in all cases—could not be obviated by state court construction.

The State's Attorney nonetheless argues that abstention is warranted because the procedural deficiencies found by the district court—absence of any provisions for counsel, anonymity, and timing of the hearing—can be provided by the state courts. While acknowledging that the Act does not mandate any of these safeguards, he argues that the state courts could, under existing practices and procedures, provide them in this setting. But even if state court construction could modify or even obviate some of plaintiffs' constitutional challenges, we would still find *Pullman*-type abstention inappropriate.

The judicially-created abstention doctrine is rooted in equity. Accordingly, in determining whether to abstain, the need for clarification must be balanced against the effects of abstaining. *See Bellotti, supra,* 428 U.S. at 150, 96 S.Ct. 2857; *Lister v. Lucey,* 575 F.2d 1325, 1332 (7th Cir. 1978). We hold that the minimal benefits which may inure by permitting the state courts to construe the procedural aspects of the judicial consent provision are outweighed by the adverse consequences of abstaining.

As we have already noted, part of the Act is clear and unambiguous: all minors

---

**6.** The defendants in *Bellotti* also asserted that the statute required that parents regard only the minor's interests in considering whether to consent and that a court could permit an abortion without parental consent for a minor incapable of rendering informed consent provided the abortion is found to be in the minor's best interest. *See* 428 U.S. at 144–45, 96 S.Ct. 2857.

**7.** The Supreme Judicial Court of Massachusetts in *Baird v. Attorney General,* Mass., 360 N.E.2d 288 (1977), held that the mature-minor rule did not apply to abortions and that minors were required to obtain parental consent in all cases. As a result of this interpretation the three judge court held the statute unconstitutional and enjoined its enforcement. *Baird v. Bellotti,* 450 F.Supp. 997 (D.Mass.1978).

must attempt to obtain the consent of both parents as a prerequisite to obtaining an abortion. Consequently, we are required to determine the constitutionality of this provision notwithstanding the State's Attorney's abstention argument with respect to the other provisions of the statute. To abstain on the validity of the judicial consent provision while ruling on the parental consent provision would engage different courts in ascertaining the constitutionality of the same statute. Such piecemeal adjudication is not sound.

Other more compelling considerations militate against abstention with regard to the judicial consent provision. *Pullman*-type abstention brings about delays while the federal court suspends consideration. The delay is aggravated here because, unlike Massachusetts, Illinois lacks a procedure whereby a federal court can certify questions of state law to the Illinois Supreme Court for determination. Furthermore, it is doubtful whether a single state adjudication would be sufficient to clarify fully the statute. Unlike the typical abstention where the statute is unclear and can be clarified by a single lawsuit, here the judicial consent provision is incomplete—no procedures are specified in the Act. Because the circuit courts of each county are

free to develop their own procedures, a definitive determination of all the procedures required by state law would undoubtedly entail a number of decisions before the statute could be sufficiently clarified. Until that time, the certainty of a law of substantial social impact would remain unsettled. More crucially, the delay inherent in such piecemeal adjudication would inhibit minors' ability to exercise their fundamental right to privacy.[8] Of particular concern is that the denial of these rights would result in irreversible consequences. Moreover, piecemeal adjudication would cause a chilling effect bringing about the same result.[9] In sum, the burdens that *Pullman*-type abstention would place on plaintiffs is too great to be justified by the minimal benefits that such abstention may produce in altering the difficult constitutional questions presented in this case.[10]

B. The State's Attorney also contends that the district court should have refrained from exercising jurisdiction under the abstention doctrine as articulated in *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). *See generally* C. Wright, Law of Federal Courts § 52 at 222 (3d ed. 1976). *Burford*-type abstention is appropriate when the matter *sub*

**8.** As we noted in *Zbaraz v. Quern*, 572 F.2d 582, 587 (7th Cir. 1978):

The importance of this consideration is not entirely abated by the possibility that the state courts might issue a preliminary injunction pending a decision on the statutory construction issues which appellants would raise.

**9.** This case is therefore different from the situation presented in *Yesterday's Children v. Kennedy*, 569 F.2d 431 (7th Cir. 1977). In that case this court ordered abstention so that the Illinois courts could determine the circumstances under which they would lift a statutory prohibition on disclosure to adopted children of the identity of their natural parents. The vindication of the constitutional rights involved in *Yesterday's Children* is of far less urgency than the preservation of the constitutional rights involved here. Plaintiffs in *Yesterday's Children* sought information regarding an historic fact concerning their lives. Here plaintiffs seek to exercise a constitutional right which becomes

physically more difficult with each passing day. Indeed, their right to terminate their pregnancy may be frustrated entirely if they are prevented from acting with dispatch.

**10.** We also note that *Pullman*-type abstention may increase rather than decrease the tensions between federal and state courts, as illustrated by the history of *Bellotti v. Baird*. In that case a three-judge court held the Massachusetts parental consent provision unconstitutional. 393 F.Supp. 847 (D.Mass.1975). After the Supreme Court reversed and ordered abstention, 428 U.S. 132, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976), the Massachusetts Supreme Judicial Court pronounced a construction of the statute. *Baird v. Attorney General*, Mass., 360 N.E.2d 288 (1977). On May 2, 1978, over three and one-half years after the suit had been filed, the three-judge court again held the statute unconstitutional and enjoined its enforcement. 450 F.Supp. 997 (D.Mass.1978).

*judice* bears on policy problems of substantial public import whose importance transcends the result in the particular controversy. *Colorado River, supra,* 424 U.S. at 814, 96 S.Ct. 1236. Unlike *Pullman*-type abstention, *Burford*-type abstention does not require unclarity in a state law. Rather, a court abstaining under *Burford* relegates a federal issue to the state courts because of their superior competence to adjudicate such matters or because the federal issues touch matters of traditional state concern, the resolution of which is of singular importance to the administration of state affairs. *BT Investment Managers, Inc. v. Lewis,* 559 F.2d 950, 955 (5th Cir. 1977). *See also Kelly Services, Inc. v. Johnson,* 542 F.2d 31, 32 (7th Cir. 1976). Abstention is warranted in such situations because federal review of the question "would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *Colorado River, supra,* 424 U.S. at 814, 96 S.Ct. at 1245.

The State's Attorney is correct in asserting that the issues raised in this case bear on policy considerations of substantial public interest. But there is nothing about the nature of the questions which concern matters of traditional and predominant state interest or which involve a specialized aspect of local law. Nor is there anything in the history of state judicial experience which suggests that state courts have a particular expertise and therefore dictates that only they can decide the questions of federal constitutional law involved in this action.

A declaration that the Illinois Parental Consent Act is violative of the United States Constitution may indeed disrupt the State's policy. But as Mr. Justice Marshall recently noted: "[T]here is, of course, no doctrine requiring abstention merely because resolution of a federal question may result in overturning a state policy." *Zablocki v. Redhail,* 434 U.S. 374, 379–80 n.5, 98 S.Ct. 673, 677 n.5, 54 L.Ed.2d 618 (1978). To hold otherwise would mean as a practical matter that a federal court could never declare a state statute unconstitutional. We conclude, therefore, that the district court was correct in refusing to abstain and in reaching the merits.

IV

Much of the controversy between the parties centers on the rights and interests which are involved in this case. We believe that confusion can be avoided and the issues and analysis clarified by initially identifying those rights and interests, their nature, and their scope.

A. *Rights of Minors.*[11] Until recent years, minors were afforded little protection under the Constitution.[12] But the Supreme Court has come to recognize that minors also possess constitutional rights. "[W]hatever may be their precise impact, neither the Fourteenth Amendment nor the Bill of Rights is for adults alone." *In re Gault,* 387 U.S. 1, 13, 87 S.Ct. 1428, 1436, 18 L.Ed.2d 527 (1967). Thus, a number of constitutional guarantees have now been extended to minors.[13]

In *Planned Parenthood v. Danforth,* 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788

11. We use the word "minor" in this opinion with some misgiving. We recognize that there are vast differences between a child and an adolescent, and an adolescent and a mature teenager, all of whom are minors.

12. Traditionally, minors were entitled "not to liberty, but to custody." *In re Gault,* 387 U.S. 1, 17, 87 S.Ct. 1428, 1438, 18 L.Ed.2d 527 (1967). Children were often held to be the property of their parents. *See generally* Note, *Parental Consent Requirements and Privacy Rights of Minors: The Contraceptive Controversy,* 88 Harv.L.Rev. 1001 (1975); Note, *The*

*Minor's Right to Abortion and the Requirement of Parental Consent,* 60 Va.L.Rev. 305 (1974).

13. Minors are entitled to constitutional protection for freedom of speech, *Tinker v. Des Moines School Dist.,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); equal protection against racial discrimination, *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); procedural due process in civil contexts, *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); and a variety of rights of defendants in criminal proceedings, including the requirement of proof beyond a reasona-

(1976), the Supreme Court determined that minors are also protected by the right of privacy, a right which previously had been held to encompass a woman's decision whether to complete or terminate her pregnancy. *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). Noting that "[c]onstitutional rights do not mature and come into being magically only when one attains the state-defined age of majority," the Court in *Danforth* held that "the State does not have the constitutional authority to give a third party an absolute, and possibly arbitrary, veto over the decision of the physician and his patient to terminate the patient's pregnancy, regardless of the reason for withholding the consent." 428 U.S. at 74, 96 S.Ct. at 2843.

■ Although a minor possesses the right of privacy, defined as "the right of the individual . . . to be free of unwarranted governmental intrusion into . . . the decision whether to bear or beget a child," *Eisenstadt v. Baird*, 405 U.S. 438, 453, 92 S.Ct. 1029, 1038, 31 L.Ed.2d 349 (1972), that right is not unqualified.[14] It has been long recognized in a variety of contexts that "the power of the state to control the conduct of children reaches be-

yond the scope of its authority over adults." *Prince v. Massachusetts*, 321 U.S. 158, 170, 64 S.Ct. 438, 444, 88 L.Ed. 645 (1944). Restraints on the freedom of minors may be justified "even though comparable restraints on adults would be constitutionally impermissible." *Danforth, supra,* 428 U.S. at 102, 96 S.Ct. at 2856 (Stevens, J., concurring in part and dissenting in part).[15] States have been allowed more control over the activities of minors in recognition of the state's interest in protecting minors and providing for their welfare.

■ Although a state has broader authority to regulate the activities of minors, any state interference with a minor's fundamental privacy right must be based on a "significant state interest,"[16] *Carey, supra,* 431 U.S. at 693, 97 S.Ct. 1029; *Danforth, supra,* 428 U.S. at 75, 96 S.Ct. 2831, and must be implemented by "legislative enactments . . . narrowly drawn to express only the legitimate state interests at stake." *Roe v. Wade*, 410 U.S. at 156, 93 S.Ct. at 728. State restrictions on the exercise of that right cannot be unduly burdensome *Bellotti, supra,* 428 U.S. at 147–48, 96 S.Ct. 2857; *Maher v. Roe*, 432 U.S. 464, 473–74, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977),

ble doubt, *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), the prohibition of double jeopardy, *Breed v. Jones*, 421 U.S. 519, 95 S.Ct. 1779, 44 L.Ed.2d 346 (1975), the rights to notice, counsel, confrontation, and cross-examination, and not to incriminate oneself, *In re Gault*, 387 U.S. 1, 86 S.Ct. 1922, 16 L.Ed.2d 1013 (1967).

**14.** This right of privacy is not unlimited even for adult women as a state may limit the availability of abortions during the later stages of pregnancy and may circumscribe the time, place, and conditions under which they may get abortions. *See, e. g., Carey v. Populations Services International*, 431 U.S. 678, 686, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977). But because this privacy right is fundamental and intrudes on "the most intimate of human activities and relationships," *id.* at 685, 97 S.Ct. at 2017, regulations limiting these rights may be justified only by a compelling state interest. *Roe v. Wade*, 410 U.S. 113, 155, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

**15.** For example, in *Ginsberg v. New York*, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968), the Supreme Court, in upholding an obscenity law, held that a State may ban certain material from minors even though it could not constitutionally ban the same materials from adults.

**16.** This standard of judicial review is apparently less rigorous than the "compelling state interest" test applied to restrictions on the privacy rights of adults. *See Carey, supra,* 431 U.S. at 693 n.15, 97 S.Ct. 2010. Although the Supreme Court has yet to articulate precisely the scope of this test, it is clear that it requires that the state make a strong showing.

> [W]hen a State . . . burdens the exercise of a fundamental right, its attempt to justify that burden as a rational means for the accomplishment of some significant State policy requires more than a bare assertion . . . that the burden is connected to such a policy.

*Id.* at 696, 97 S.Ct. at 2022.

and will be stricken if the state has alternative, less obtrusive means by which it can effectuate its interest. *See Braunfeld v. Brown*, 366 U.S. 599, 607, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1960).

B. *Interests of the State.* In support of the Illinois Parental Consent Act, the State asserts essentially two distinct interests: (1) its interest in protecting the minor, that is, ensuring that her decision either to complete or to terminate her pregnancy is an informed one, thus protecting the minor from her own improvidence; and (2) its interest in preserving the family as a viable and stable unit in society, and a related interest in safeguarding parental authority.[17]

 We find both interests significant. The State's first interest, that the minor's decision be an informed one, goes to the heart of the minor's right to decide whether to terminate her pregnancy. Clearly the right cannot be exercised properly unless the decision is informed, with knowledge of available alternatives, if any, and the consequences of each. The State's second interest, in protecting the family, is equally significant. Because the family is the primary unit through which social values and moral precepts are transmitted to the young, the State has an interest in not undermining that unit. Although the State's interests are significant, the question remains whether the legislation here serves those interests, and whether the legislation is drawn so as to not unduly burden the exercise of the minor's fundamental right.

C. *Rights of Parents.* The rights of parents to supervise and direct the rearing of their children free from state interference is firmly established. For example, in *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), the Supreme Court, in upholding the rights of Amish parents to disregard mandatory school attendance statutes, stated:

> [T]his case involves the fundamental interest of the parents . . . to guide the religious future and education of their children. This history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition.

406 U.S. at 232, 92 S.Ct. at 1541. *See also Smith v. Organization of Foster Families*, 431 U.S. 816, 842–44, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977); *Ginsberg v. New York*, 390 U.S. 629, 639, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968). Indeed, "those who nurture [the minor] and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Pierce v. Society of Sisters*, 268 U.S. 510, 535, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1924). *See also Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923).[18]

 The ambit of parental authority afforded constitutional protection is broad in scope. The Supreme Court has recognized the right to include "the inculcation of moral standards, religious beliefs, and elements of good citizenship." *Yoder, su-*

---

**17.** As with any abortion, the State also has an interest in protecting prenatal life and safeguarding maternal health. *Roe v. Wade*, 410 U.S. 113, 162–63, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). The State in this case had not argued that its concern for fetal life and maternal health is in any way different or more compelling when the woman seeking an abortion is a minor. Consequently, because the Parental Consent Act could not withstand constitutional challenge under these interests alone, the Act and its infringements on minors' rights can be justified only by additional interests not considered in *Roe v. Wade*.

**18.** In none of the cases establishing the constitutional doctrine of parental rights vis-a-vis the state were the rights of minors raised in contradistinction to those of their parents. Thus, although the *Meyer-Pierce-Yoder* line of cases may be helpful, they cannot be regarded as controlling when a minor's constitutional rights are in conflict with those of her parents.

*pra,* 406 U.S. 233, 92 S.Ct. 1526, 1542. To us this means that parents are not legally restricted in advising and consulting with their children on any subject, including specifically whether a minor pregnant daughter should or should not undertake a legal abortion.

 The constitutional rights of parents, as that of minors, are not absolute. "The power of the parent, even when linked to a free exercise claim, may be subject to limitation . . . if it appears that parental decisions will jeopardize the health or safety of the child, or have a potential for significant social burdens." *Yoder, supra,* 406 U.S. at 233–34, 92 S.Ct. at 1542. In rejecting a claim that a child labor law unreasonably interfered with the parental right to direct the child's upbringing without state interference, the Supreme Court stated:

> Parents may be free to become martyrs themselves. But it does not follow they are free, in identical circumstances, to make martyrs of their children.

*Prince v. Massachusetts,* 321 U.S. 158, 170, 64 S.Ct. 438, 444, 88 L.Ed. 645 (1944). Parental rights are accorded constitutional protection only against unwarranted or unreasonable interference by the state. *Planned Parenthood v. Danforth,* 428 U.S. 52, 73, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976). Thus, even though a parent has an interest in the decision whether the minor is to have an abortion, the state has the power and duty to exclude the parent from the decision-making process if it is determined that exclusion would better serve the minor's welfare.

 The rights of parents must also yield to the fundamental rights of their children. This was made clear in *Planned Parenthood v. Danforth,* 428 U.S. 52, 75, 96 S.Ct. 2831, 2844, 49 L.Ed.2d 788 (1976), where the Court stated:

Any independent interest the parent may have in the termination of the minor daughter's pregnancy is no more weighty than the right of privacy of the competent minor mature enough to have become pregnant.

Because it is the minor, not the parents, who physically bears the child and faces the physiological and emotional risks attendant to childbirth, and because it is the minor, not the parents, who is responsible for the child once it is born, the Court held that parents do not have the right to stop an abortion if their mature daughter, with the consent of her physician, decides to terminate the pregnancy. Although the Court in *Danforth* held that the parental rights did not outweigh the minor's rights when they are in direct conflict, the Court did not otherwise delineate the scope of the parental rights. The breadth of those rights, and the degree to which parents may participate in the minor's decision are indeed the major questions before us today. With these considerations in mind, we turn to the challenged provisions of the Parental Consent Act.

## V

A. The Act requires parental consent for a minor to obtain an abortion. If "such consent is refused or cannot be obtained," a minor may then seek consent by a judicial order. These requirements mean that the minor's parents must always be notified of their daughter's desire.[19] Defendants justify this mandatory requirement as serving both the State's interest in protecting minors from uninformed and possibly improvident decisions and in ensuring that the parental interests in their children are preserved.

The State first argues that the mandatory parental consent requirement is justified because it ensures that minors will receive adult guidance and thereby assures that the

---

**19.** Parental notification is further assured under the Act by notice to the parents of the minor's application for judicial relief.

pregnant minor's decision will be an informed one. As laudable as the State's goal of an informed decision may be, we seriously question whether the statute achieves that objective. Most notably, minors who are married, divorced or widowed are not covered by the Act. Consequently, such a minor need not consult or notify her parents or any other adult; she may consent alone.[20] We agree with the Supreme Court of Washington when it said that "[m]arried minors are not necessarily more mature and responsible than their unmarried contemporaries." *State v. Koome,* 84 Wash.2d 901, 530 P.2d 260, 267 (1975). The State's concern that a minor receive parental guidance about a prospective abortion is undermined when a significant segment of pregnant minors is not afforded that guidance. In short, the statute distinguishes between two classes of minors without any showing of justification for the distinction.[21]

The Act also makes no exception for unmarried minors who are mature or emancipated, or who receive counseling and guidance from physicians or others in regard to the consequences of the decision to have an abortion.[22] By requiring the minor to attempt to obtain the consent of both of her parents, the statute in effect creates a presumption of incompetence to consent. That presumption is inconsistent with Illinois' own statutory scheme covering minors.

■ In Illinois, a pregnant minor who chooses to give birth may consent to any medical or surgical treatment without the necessity of parental consent.[23] Ill.Rev. Stat. ch. 91, § 18.1. That legislation presumes that pregnant minors are sufficiently knowledgeable and mature to consent knowingly. The State has suggested no reason why pregnant minors are less capable of deciding whether to terminate their pregnancy than they are to decide whether to carry their pregnancy to term, or even to have a Caesarian section, a far more dangerous procedure than a first trimester abortion. We hold, therefore, that the Act, at least in regard to the objective of informed decisions, is underinclusive because it excludes married minors and overinclusive because it includes mature and emancipated minors.

The interest of the State in preserving parental interests in raising their children presents a more difficult question. As noted earlier, parents have a substantial interest in participating in their daughter's deci-

---

**20.** As spousal consent statutes are unconstitutional, *Planned Parenthood v. Danforth,* 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1972), a married minor in Illinois may terminate her pregnancy without consent or notice to anyone.

**21.** *See Rinaldi v. Yeager,* 384 U.S. 305, 86 S.Ct. 1497, 16 L.Ed.2d 577 (1966). In that case a New Jersey Statute required unsuccessful criminal defendants-appellants who were sentenced to prison to reimburse the state for the transcript which it furnished. Unsuccessful appellants who were fined or who received probation or suspended sentences were exempted from repayment. The Court held that the statute was violative of equal protection because the classification created by the statute—whether a convict was sentenced to prison—bore no relevance to the fiscal objective of the Act.

**22.** The statute overlooks the guidance which physicians provide in determining whether an abortion should be performed. The Supreme Court in *Roe v. Wade,* 410 U.S. 113, 166, 93

S.Ct. 705, 35 L.Ed.2d 147 (1973), made clear that the abortion decision is both the woman's *and* her attending physician's. Thus, in the usual situation, the minor will not be acting without counsel or guidance.

**23.** Illinois recognizes that a minor has the capacity for self-determination in other areas as well. For example, she can consent to treatment for venereal disease, Ill.Rev.Stat. ch. 91, § 18.3, and can receive contraceptives without parental consent. Ill.Rev.Stat., ch. 91, § 18.7. If a minor is presumed to be able to consent to obtain medical treatment to avoid an unwanted pregnancy by getting contraceptives, it makes little sense to say that she cannot consent to an abortion where contraceptives were unavailable or unsuccessful. Furthermore, the Act itself requires the minor's written consent that her decision is "informed and freely given and is not the result of coercion." Section 4(2). By this provision the minor is statutorily acknowledged to be able to consent to the abortion.

sion. Obviously, the only way in which they can exercise that right is if they are informed as to their daughter's condition. The parents' right to know is therefore in direct conflict with the minor's right of privacy.

The statute, by requiring in essence that both parents be informed in every case, does not take into account the fact that such notice frequently might be inconsistent with a minor's best interests.[24] That it may not be in the minor's best interests to have her parents informed of her condition in all cases is recognized by the Illinois General Assembly. A number of statutes enable minors to receive medical care without the parents being informed. For example, a minor can receive birth control devices and treatment for venereal disease and drug use without parental notice. Ill. Rev.Stat. ch. 91, §§ 18.3 & 18.7. Legislation of this type recognizes that in certain situations when minors may be hesitant to inform their parents of their condition, enabling those minors to obtain counseling and medical care without involving their parents may not only be in their best interests but may also serve the public interest in assuring that medical care is provided.

■ We do not hold that parents cannot be notified of their daughter's condition. To the contrary, because we believe that parents should be involved in their minor's decision whenever possible, they generally should be informed. Nor do we hold that a minor should be free not to inform her parents merely because such disclosure may cause familial disharmony. The objectionable feature of the statute is rather that it requires that the parents be informed in *all* cases, thereby precluding an independent

assessment, whether by a court or physician, that it would not be in the minor's best interests for her parents to learn of her condition.[25]

■ B. If one or both of the parents refuse to consent to the abortion, the Act requires that the minor must initiate judicial proceedings to override this veto. We find this to be an undue burden such as that held unconstitutional in *Doe v. Bolton*, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973).

A decision to obtain a court order presupposes an awareness of the existence of the remedy, an awareness simply not possessed by many minors. In these circumstances, as the district court correctly noted, "[i]f she is uninformed in this regard [availability of a judicial remedy] the parents' de facto refusal becomes a de jure veto . . ." 448 F.Supp. 1004. Indeed, from a practical standpoint, the parental veto under this statute is the same as the veto struck down in *Planned Parenthood v. Danforth*, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976).

The difficulties that a minor faces are not less formidable for one who is aware of the procedure. Even if aware, the minor is faced with the enormous burden of going to court, without legal assistance and in opposition to her parents' wishes. Many minors may simply not go to court and instead resort to an illegal or self-procured abortion. This would clearly contravene the State's interest in the health of the mother and the welfare of minors.

For those minors sufficiently determined to initiate court proceedings over parental opposition, the Act still places an undue burden upon them. Such proceedings, with parents present as opposing parties, will certainly destroy what was left of the fami-

---

**24.** There are a variety of reasons why it could be inconsistent with a minor's best interests to have one or both of her parents know of her pregnancy. For example, parents may physically abuse the minor upon disclosure of the pregnancy. Rather than inflicting physical harm, parents may force the pregnant minor to enter into a marriage which she does not want.

Others may compel the minor to continue her pregnancy simply as punishment.

**25.** Such an independent assessment is made for minors who receive treatment for venereal disease or drug use. Ill.Rev.Stat. ch. 91, § 18.5 provides that it is within the discretion of the attending physician to inform the parents of any treatment given or needed.

ly relationship. As Judge Aldrich said recently in *Baird v. Bellotti,* 450 F.Supp. 997, 1002 (D.Mass.1978):

> The minor, accordingly, is in a no-win situation. If she loses the judicial proceedings, it will be a personal blow, and scarcely a redemption of the ill feeling and tension that undoubtedly resulted from her parents' refusal of consent and her taking them to court. If she wins, according to defendants' own expert, she is likely to find herself in an even worse position.

Furthermore, the delay involved in first trying to obtain parental consent followed by the delay inherent in any judicial proceeding is unreasonable.[26] It might force the minor into either a second trimester abortion which is more dangerous and expensive [27] or into not having an abortion at all if the second trimester has expired. For these reasons, we hold that the statutory requirement of parental consent as a precondition to a judicial proceeding plus the foregoing burdens created by having to go to court erect unconstitutional barriers to the exercise of a minor's fundamental right to terminate her pregnancy.

Plaintiffs urge us to declare that requiring any judicial proceeding is *per se* unduly burdensome and therefore unconstitutional. Although plaintiffs advance persuasive arguments for their position, we find it unnecessary to reach the issue because the judicial proceeding as presently drafted does not meet constitutional standards.

The Act makes no provision for the appointment of counsel.[28] It does not guarantee a speedy proceeding with provision for expedited review.[29] Nor does the Act provide any safeguard for preserving the anonymity of the pregnant minor. (Indeed, if the right to privacy means anything, it means that the minor should be free to make her decision without fear that the decision she makes will be exposed to public scrutiny.) In short, the Act totally fails to provide any of the essential features which the Supreme Court intimated were minimally necessary. *See Bellotti v. Baird,* 428 U.S. at 144–45, 96 S.Ct. 2857 (statute must provide a "speedy," "nonburdensome," and "anonymous" procedure whereby a minor can obtain judicial authorization for an abortion.)

Defendants argue that all these safeguards are presently available, though they concede that they are available only at the discretion of the judge. We cannot agree that the mere possibility that these procedures may be employed can save the statute from attack. Because of the fundamental nature of the rights involved, because of the lack of legal sophistication of minors generally, and because of the urgency inherent in an abortion decision itself, it is imperative that the procedure be spelled out in detail in the statute itself. We fully concur with the district court when it said:

> When, however, a new judicial proceeding is created which has as its purpose

---

**26.** Even if the minor obtains a court order, she must wait an additional 48 hours before she can actually obtain the abortion. *See* § 4(2) of the Act. Furthermore, if one considers the delays involved in appellate review, the matter may become moot.

**27.** All second and third trimester abortions must be performed in a hospital. *See* § 4 of the Illinois Abortion Law of 1975.

**28.** It appears that Legal Services Corporation attorneys will be unable to handle actions under the Act. *See* 42 U.S.C. § 2996f(b)(8) (prohibiting the use of Legal Services Corporation funds where an individual seeks to procure a non-therapeutic abortion). Thus, a minor is required to navigate at least the initial stages of

a judicial procedure either on her own or with private counsel. Yet, it is obvious that private counsel will be beyond the resources of most teenagers.

**29.** Speed is critical in the abortion context. "Risks during the first trimester are admittedly lower than during later months." *Doe v. Bolton,* 410 U.S. 179, 198, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973). "Delaying the abortion decision or its effectuation can cause psychological and medical problems, especially as the minor approaches the end of the first trimester." *Baird v. Bellotti,* 393 F.Supp. 847, 853 (D.Mass.1975), *rev'd on other grounds,* 428 U.S. 132, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976).

the restriction or, at the very least, the superintendence of the exercise of a right guaranteed by the Constitution, all of the steps in and dimensions of that proceeding must be visible before a constitutional assessment of the proceeding can be made.

448 F.Supp. at 1004.

 C. We also find the Parental Consent Act to be deficient because it fails to provide for minors who do not understand the consequences of an abortion. The only judicial inquiry permitted by the Act is whether "the pregnant minor fully understands the consequences of an abortion to her and her unborn child." Consequently, if a court finds that a minor is unable to understand fully the consequences of the act, the parents' decision to refuse to consent will prevail because the court can take no further action.[30]

Under the statute, a parent's opposition always prevails with regard to this type of minor. Although the parents' views may be entitled to greater weight when such minors are involved, *Danforth* does not permit the parents to have "an absolute, and possibly arbitrary, veto over the decision of the physician and his patient to terminate the patient's pregnancy, regardless of the reason for withholding the consent." 428 U.S. at 74, 96 S.Ct. at 2843. To withstand constitutional challenge, a mechanism must be provided so that the State, under its *parens patriae* power, can protect the health and welfare of its minors against possible arbitrary action by the parents. In sum, the Act is substantively deficient in failing to provide a standard under which a judicial order can be obtained where the minor is incapable of giving informed consent.

## VI

Although the Illinois Abortion Parental Consent Act of 1977 attempts to balance the competing rights of the minor and her parents, it leaves the rights of the pregnant minor in a precarious position on the light side of the scale. She is the one who is required to shoulder all the burdens of trying to obtain her parents' consent and, if unsuccessful in that regard, of commencing and satisfactorily treading the inadequate judicial framework delineated in the Act— all at a time when she is experiencing one of the most physically and psychologically critical periods of her life. To pass constitutional muster, a statute such as this must be drafted in a way to aid the minor by easing her burdens rather than adding to them. As presently drafted the Act does not meet that prerequisite; instead, it impermissibly impairs the exercise of a pregnant minor's constitutional rights.

The order of the district court is affirmed.

## APPENDIX

## ILLINOIS HOUSE BILL 480

## ILLINOIS ABORTION PARENTAL CONSENT ACT OF 1977

Section 1. Legislative Intent. It is the intent of the General Assembly of the State of Illinois that the rights and responsibilities of parents be respected, that the health and welfare of minors and their unborn children be protected, and that no minor child who has not married shall be allowed to undergo an abortion operation without the consultation and consent of her parents, or a court order as part of the informed consent of the minor child seeking the abortion.

Section 2. Title of Act. This Act shall be known and may be cited as the Illinois Abortion Parental Consent Act of 1977.

Section 3. As used in this Act, "abortion" means the use of any instrument,

---

**30.** In such circumstances, an abortion will not be performed even though the minor wants the abortion, one of her parents consents to the abortion, and the court finds that an abortion would be in the minor's best interests.

medicine, drug or other substance, whatever, with the intent to procure a miscarriage of any woman, regardless of whether the woman is pregnant or whether a miscarriage is accomplished.

Section 4. No abortion shall be performed in this State if the woman is under 18 years of age and has not married except:

(1) By a duly licensed, consenting physician in the exercise of his best clinical medical judgment;

(2) After the minor, 48 hours prior to submitting to the abortion, certifies in writing her consent to the abortion and that her consent is informed and freely given and is not the result of coercion; and

(3) After the consent of her parents is secured and certified in writing.

If one of the parents has died, has deserted his or her family, or is not available, consent by the remaining parent is sufficient. If both parents have died, have deserted their family, or are not available, consent of the minor's guardian or other person standing in loco parentis is sufficient.

If such consent is refused or cannot be obtained, consent may be obtained by order of a judge of the circuit court upon a finding, after such hearing as the judge deems necessary, that the pregnant minor fully understands the consequences of an abortion to her and her unborn child. Such a hearing will not require the appointment of a guardian for the minor. Notice of such hearing shall be sent to the parents of the minor at their last known address by registered or certified mail. The procedure shall be handled expeditiously.

The Department of Public Health shall prescribe a written form for such consent. Such form shall be signed by the proper person or persons and given to the physician performing the abortion who shall maintain it in his permanent files.

Nothing in this Section shall be construed as abolishing or limiting any statutory or common law rights of any other person or persons relative to consent to the performance of an abortion for purposes of any civil action or any injunctive relief. This Section does not apply to any abortion performed which is necessary for the preservation of the life of the mother.

Section 5. Any person who performs an abortion in violation of this Act commits a Class A misdemeanor.

Section 6. This Act takes effect January 1, 1978.